AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. FRANZ GREY | DOCKET NO. JUN 1 2 2018 |
|---|---|
| | MAGISTRATE'S CASE NO. 18 MJ01515 |

Complaint for violation of Title 18, United States Code, Section 922(g)

| NAME OF MAGISTRATE JUDGE THE HONORABLE PAUL L. ABRAMS | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE May 3, 2018 | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [18 U.S.C. § 922(g)]

On or about May 3, 2018, in Los Angeles County, within the Central District of California, defendant FRANZ GREY ("GREY ") knowingly possessed a firearm, namely, an SKS 7.6 x 39mm semiautomatic rifle, bearing serial number VN3784, and an R461, .357 Magnum revolver bearing serial number ZI423269, in and affecting interstate commerce. Such possession occurred after defendant GREY had been convicted of the felony crimes described in the attached affidavit, which are punishable by a term of imprisonment exceeding one year.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT HANNAH MONROE /s/ |
|---|---|
| | OFFICIAL TITLE Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) PAUL L. ABRAMS | DATE June 12, 2018 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA David T. Ryan x4491        REC: Detention



## AFFIDAVIT

I, Hannah Monroe, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for FRANZ GREY ("GREY") for a violation of Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm).

2. This affidavit is also made in support of an application for a warrant to search 18 digital devices (collectively, the "SUBJECT DEVICES"), seized on May 31, 2018, and currently in the custody of the Federal Bureau of Investigation in Los Angeles, California, as described more fully in Attachment A, which is incorporated herein by reference, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 922(g) (Felon in Possession of a Firearm), 922(o) (Possession of a Machine Gun), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1028A (Aggravated Identity Theft), 1029 (Fraud and Related Activity in Connection with Access Devices), and Title 21, United States Code, Sections 841(a)(1) (Distribution or Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy to Distribute or Possess with Intent to Distribute Controlled Substances) as described more fully in Attachment B, which is also incorporated herein by reference.

1

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR FBI SPECIAL AGENT HANNAH MONROE

4. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed for approximately two years. Prior to becoming a Special Agent, I was a Staff Operations Specialist with the FBI for approximately two years. I am currently a member of the FBI's Domestic Terrorism squad in Los Angeles, California.

5. Since joining the FBI in 2014, I have received training in the investigation of violations of criminal law, such as drug-trafficking, computer-related crimes, and financial fraud, including several hundred hours of formal training at the FBI Training Academy in Quantico, Virginia. I have participated in investigations relating to illegal firearms possession, organized crime, home-grown violent extremism, access device fraud, identity theft, narcotics, and computer intrusions. I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence,

2

conducting electronic and physical surveillance, working with informants, and the execution of search and arrest warrants. Additionally, I have interviewed and/or debriefed informants, and other witnesses who had personal knowledge regarding the investigations in which I have been involved. Based on my training and experience and my conversations with other law enforcement officers, I am familiar with the identification of certain drugs, firearms, and firearm components and characteristics.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.     On May 3, 2018, Los Angeles Sheriff's Department ("LASD") officers searched GREY's house at 42957 38th Street West, Lancaster, California ("GREY's Residence") pursuant to a state search warrant and found approximately 10 firearms, numerous rounds of ammunition, approximately 6 grams of methamphetamine, a digital scale, numerous checks, credit cards, and debit cards belonging to various different people, an identification card printer, and materials used to make pipe bombs. During a recorded <u>Mirandized</u> interview, GREY admitted that the weapons and ammunition were his, that he had materials used for pipe bombs, and that he was a felon and knew he was not lawfully permitted to possess a firearm. GREY also admitted he possessed the identification card printer to make counterfeit cards.

7.     On May 31, 2018, LASD and FBI agents searched GREY's Residence again pursuant to another state search warrant and found approximately 16 grams of methamphetamine, numerous rounds

of ammunition, a large amount of U.S. currency, and the SUBJECT DEVICES. Officers also found a homemade firearm in GREY's truck.

### IV. STATEMENT OF PROBABLE CAUSE

8. Based on my participation in this investigation, as well as my review of investigative and arrest reports and my conversations with other law enforcement officers who participated in this investigation, I know the following information.

### A. LASD Officers Find Firearms, Ammunition, and Methamphetamine in GREY's Residence

9. Based on my review of law enforcement reports, as well as my conversations with other law enforcement officers who were involved in this investigation, I know the following:

10. On or about May 3, 2018, LASD officers assisted the City of Lancaster with the execution of an Inspection Warrant the city had received for GREY's Residence to address numerous city code violations.[1]

11. Before executing the warrant, officers consulted public records and saw that GREY had been associated with GREY's Residence for approximately two years. LASD officers had also had multiple contacts with GREY at GREY's Residence throughout those two years, and on some of those occasions, GREY told officers he lived at GREY's Residence.

---

[1] An "Inspection Warrant," which is also commonly referred to as an "Abatement Warrant," authorizes city officials to enter private property to inspect it for various health and safety code violations. See generally, California Code of Civil Procedure Sections 1822.50-1822.60.

12.    Outside GREY's Residence, near the garage, officers saw an unspent nine millimeter round.  Inside GREY's residence, officers encountered GREY, who was the only person present.

13.   During their search, officers saw, in plain view in various rooms throughout the house, several rounds of ammunition, multiple loaded handguns and rifles, various firearm parts, drug paraphernalia, and a plastic baggie containing a small amount of suspected methamphetamine.

14.   Before searching GREY's Residence, LASD officers had consulted law enforcement databases and seen that he had previously been convicted of at least one felony, and therefore was not permitted to possess a firearm.  As a result, officers received and executed a state search warrant later on May 3, 2018.

15.   During that search, officers found:

a.    Approximately 10 firearms, and numerous rounds of ammunition, including: one nine-millimeter magazine loaded with multiple bullets; numerous rounds of ammunition of various calibers; two homemade suppressors or silencers;[2] one Rossi model R461, .357 Magnum caliber revolver bearing serial number ZI423269 loaded with several bullets; one Kevlar helmet and one bulletproof vest; one partially disassembled AK-47 Rifle; one AK-47 barrel assembly; one homemade nine millimeter pistol with an oil filter suppressor screwed onto the muzzle; one antique

---

[2] A "silencer" or "suppressor" is a device used to reduce the sound intensity or muzzle flash when a firearm is fired

revolver of unknown make; one 80 percent 1911 frame and slide;[3]
one Calico M-900 Semi-Automatic rifle bearing serial E002526;
one Ares Armor AR-15 Semi-Automatic rifle with no serial number;
one Ares Armor AR-15 Fully-Automatic rifle with no serial
number;[4] one Russian model SKS, 7.6 x 39 mm caliber semiautomatic
rifle bearing importer serial number VN3784; one Remington model
1100, 20 gauge semi-automatic shotgun bearing serial number
L416451X; one unknown model magazine; and one single shot
Connecticut Arms muzzle load rifle bearing serial number 838213.

      b.    A plastic bag containing approximately 6 grams of
suspected methamphetamine, numerous plastic bags containing
approximately 764 grams of suspected marijuana, and drug
paraphernalia including glass tubes, beakers, and a digital
scale.

      c.    Approximately $239,699 in U.S. currency, several
blank credit cards and checks, several more credit and debit
cards bearing the names of various different people, and an
identification card printer used to make counterfeit credit and
debit cards.

---

[3] An 80 percent lower receiver is a piece of material that is
combined with an upper receiver to constitute a firearm.
[4] The fully-automatic rifle appeared to have been originally
manufactured as a semi-automatic rifle, but had been converted
into a fully-automatic rifle because a third trigger pin hole
had been drilled into the receiver of the weapon, and the
rifle's safety switch was spun to a third position, which is
normally blocked on commercial semi-automatic firearms.  The
third trigger pin hole shows that the weapon likely contains an
"auto-sear," which is a device that enables the weapon fire in
"fully automatic" or "select-fire" modes, meaning the weapon can
fire more than one shot per pull of the trigger.

d.     Numerous credit and debit credit cards bearing GREY's name, as well as GREY's passport.

16.     After completing the search, officers placed GREY under arrest for Possession of a Controlled Substance with a Loaded Firearm, Felon in Possession of Firearms, Felon in Possession of Ammunition, Possession of a Firearm Suppressor, Felon in Possession of Body Armor, Possession of an Assault Weapon, Credit Card Fraud, Possession of Methamphetamine for the Purpose of Sales, and Manufacturing of Concentrated Cannabis. GREY was later released on bail.

17.     On or about May 7, 2018, a Senior Criminalist with the LASD Scientific Services Bureau determined that the suspected methamphetamine was approximately 6.32 grams of a mixture or substance containing a detectable amount of methamphetamine.

**B.     GREY Admits Possessing the Firearms and Methamphetamine of GREY and WINGO**

18.     On or about May 3, 2018, after GREY's arrest, GREY agreed to participate in a recorded, <u>Mirandized</u> interview, during which GREY said the following:

a.     GREY admitted that the guns found inside GREY's Residence belonged to him, and said he had them for his personal protection.   GREY also admitted the ammunition at GREY's Residence belonged to the firearms located there.

b.     GREY admitted he was a convicted felon and was not allowed to possess any firearms.

      c.   GREY said he had bought most of the firearms on the street, and had assembled the AR-15 rifles found in his residence himself by buying parts off the internet.

      d.   GREY said he made suppressor/silencer himself after seeing them on YouTube.

      e.   When asked about the methamphetamine found at his residence, GREY said he used methamphetamine, and would buy approximately one ounce at a time. When asked if he was "cooking" methamphetamine, GREY denied making methamphetamine but said he would purify low-quality methamphetamine he bought.

      f.   GREY said the pipe components found inside his residence were for a "pipe bomb."

      g.   GREY said the Kevlar bulletproof vest belonged to him.

      h.   GREY admitted possessing the identification card printer to manufacture counterfeit credit cards and fraudulent checks, and said he had it in case he needed extra money but had not used it yet.

19. On May 10, 2018, I and other officers interviewed GREY's neighbor, J.W. During the interview, J.W. said the following:

      a.   J.W. has lived next to GREY's Residence for approximately two and a half years, and believes GREY lives in the residence by himself.

      b.   J.W. has seen GREY's behavior become increasingly aggressive and abnormal over the past two years. J.W. saw that GREY placed a shock wire fence around his property as well as

8

sophisticated surveillance cameras and numerous "No Trespassing" signs, and became aggressive toward anyone trying to enter the premises.

        c.    J.W. has heard GREY express extreme anti-government views and threaten that if anyone tries to enter his property, they will "meet their maker." J.W. has also heard GREY claim that he has a laser pointer that can shoot down the police helicopter that flies around the neighborhood.

### C.    Officers Find More Guns and Methamphetamine in GREY's Residence

      20.  During the execution of the search warrant at GREY's Residence on May 3, 2018, officers saw a 2006 Yamaha Jet Ski inside the garage. Officers later consulted law enforcement databases and saw that the jet ski had been reported stolen.

      21.  On or about May 31, 2018, officers executed a second state search warrant at GREY's Residence. When officers arrived to conduct the search, they saw a black truck driving away, stopped it, and saw GREY in the driver's seat. Officers detained GREY, patted him down, and found two unspent 12-gauge shotgun shells in GREY's left pants pocket. Officers conducted a safety sweep of GREY's truck, and found a homemade firearm bearing no serial number.

        a.    During the search of GREY's Residence, officers found: one bag containing numerous rounds of ammunition; one bag containing approximately 0.5 grams of methamphetamine; two plastic bags containing approximately 16 grams of methamphetamine; one paper bag containing five cans of butane

gas; eight bags containing an unknown amount of a leafy substance suspected to be marijuana; numerous credit cards, California Driver's Licenses, checks bearing the names of various different people, approximately $40,000 in U.S. currency, and the SUBJECT DEVICES.

22. After completing the search, officers arrested GREY for Forgery of a State Seal, Credit Card Fraud, Felon in Possession of a Firearm, and Felon in Possession of Ammunition. During a recorded, <u>Mirandized</u> interview at the Lancaster Sheriff's Station, GREY said the following:

a. GREY admitted the homemade firearm found in his truck belonged to him and said he had made it himself.

b. GREY said the methamphetamine found in his house is for personal use. GREY said he uses approximately one ounce of methamphetamine per month, which he buys for approximately $200-$220.

c. Officers asked GREY how he earned money, and GREY said he was "good at mathematics." GREY also said he had good credit and was able to acquire a large amount of currency.

d. Officers asked GREY if he had ever gone by any other names and GREY responded that he had also gone by the name "William Johnson."

e. Officers asked GREY about a backpack found in a trailer outside his residence containing miscellaneous documents belonging to other people, and GREY said the documents belonged to people staying at his residence.

23.   On or about June 1, 2018, a Senior Criminalist with the LASD Scientific Services Bureau determined that the suspected methamphetamine was approximately 16.04 grams of a mixture or substance containing a detectable amount of methamphetamine.

**D.   Multiple Firearms Found in GREY's Residence on May 3, 2018, Traveled in Interstate Commerce**

24.   On or about June 8, 2018, I spoke to Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent David Hamilton, who is an expert in determining the manufacture and origin of firearms and ammunition.   I gave Agent Hamilton a description of the firearms found at GREY's Residence and provided SA Hamilton with detailed photographs of the weapons and their markings.

25.   Based on that description and the photographs, Agent Hamilton determined that the following firearms found in GREY's Residence on or about May 3, 2018, were manufactured outside of California:

a.   The Russian model SKS, 7.6 x 39 mm caliber semiautomatic rifle bearing importer serial number VN3784 was manufactured in the country of Russia.   In order for this firearm to be recovered in the state of California, the firearm would had to have moved in foreign commerce.

b.   The Rossi model R461, .357 Magnum caliber revolver bearing serial number ZI423269 was manufactured by Forjas Taurus S.A. in the country of Brazil.   In order for this

firearm to be recovered in the state of California, the firearm must have moved in foreign commerce.

  c. The Remington model 1100, 20 gauge semi-automatic shot-gun bearing serial number L416451X was manufactured by the Remington Arms Company located in Ilion, New York.  In order for this firearm to be recovered in California, the firearm must have moved in interstate commerce.

  **E.** **GREY's Felony Convictions**

26. On or about May 27, 2018, I reviewed the criminal history report for GREY.  On or about May 30, 2018, I reviewed certified court documents from the Superior Court of California. Based on this review, I know that GREY has been convicted of the following felony crimes:

  a. Voluntary Manslaughter and Criminal Mischief on or about June 17, 1989, in the Alleghany County Court of Pennsylvania.

  b. Hit and Run Causing Injury or Death, in violation of California Vehicle Code 20001(a), and Possession of a Controlled Substance, in violation of California Health and Safety Code 11350, on or about January 3, 2008, in the Los Angeles County Superior Court.

**V.** **TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES**

27. Based on my training and experience, and information I have obtained from other law enforcement officers who investigate identity theft, I know the following:

  a. It is common practice for individuals involved in access device fraud and identity theft to use and maintain

digital devices.  These individuals use such devices to store
information about their identity theft crimes during and long
after the crimes have been committed.  This information can
include: logs of fraudulent transaction history; records of
funds received; information regarding individuals and companies
that have been victimized; records of payments from co-
conspirators; and victim profiles.  Such "profiles" contain the
personal identifying information of victims, such as names,
Social Security numbers, dates of birth, driver's license or
state identification numbers, alien registration numbers,
passport numbers, and employer or taxpayer identification
numbers.

           b.    Identity thieves oftentimes use multiple digital
devices to perpetrate their crimes due to the relative anonymity
gained by conducting financial transactions electronically on
the internet.  These individuals employ digital devices for
purposes of, among other things, (i) applying online for
fraudulent credit cards, (ii) obtaining personal identification
information for the purposes of establishing or modifying
fraudulent credit card accounts, (iii) using fraudulently
obtained credit cards to make purchases, (iv) manufacturing
counterfeit identification, credit cards, and checks, and
(v) keeping records of their crimes.

           c.    Individuals who participate in these schemes
often work with co-conspirators to collect and use personal
identifying and account information of their victims.  These
individuals often communicate by phone, e-mail, text message,

13

and social media, sometimes exchanging information and photographs related to their crimes.

## VI. TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING

28. Based on my training and experience and familiarity with investigations into drug trafficking, as well as my discussions with other law enforcement agents involved in drug trafficking investigations, I know the following:

a. The distribution of drugs is a continuing criminal activity that occurs over months, and often years. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

b. Drug traffickers use telephones, portable cellular and digital telephones, pagers, and other communication devices, sometimes in fictitious and/or other individuals' names, and maintain in such devices telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the drug-trafficking organization, as well as customers of their drug trafficking business.

c. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location

14

data, such as Global Positioning System ("GPS") information,
other locational information, and identifying information about
the trafficker and co-conspirators and the location of previous
drug transactions or stash houses, and/or the identity or
whereabouts of traffickers and co-conspirators involved in
narcotics trafficking.

    d. Because drug traffickers usually continue to sell
drugs to support themselves until they are arrested, their
communications with various co-conspirators tend to be ongoing
until their arrest.  Communications between people buying and
selling drugs take place by telephone calls and messages, such
as e-mail, text messages, and social media messaging
applications, sent to and from cell phones and other digital
devices.  This includes sending photos or videos of the drugs
between the seller and the buyer, the negotiation of price, and
discussion of whether or not participants will bring weapons to
a deal.  In addition, it is common for people engaged in drug
trafficking to have photos and videos on their cell phones of
drugs they or others working with them possess, as they
frequently send these photos to each other and others to confirm
that they are in possession of the drugs, boast about the drugs,
or facilitate drug sales.  It is also common for drug
traffickers to carry cellular telephones in order to remain in
contact with drug suppliers or customers, to communicate with
co-conspirators to facilitate drug trafficking, to coordinate
the movements of the trafficker and various co-conspirators, and
to coordinate the amount of drugs trafficked, as well as payment

15

amounts and methods.  Based on my training and experience, I
know that the above-described information can be stored on
digital devices carried by drug traffickers.

### VII.  TRAINING AND EXPERIENCE REGARDING FIREARMS

29.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.  Persons who possess, purchase, or sell firearms
generally maintain the firearms and records of their firearm
transactions as items of value and usually keep them in their
residence, or in places that are readily accessible, and under
their physical control, such as a residence.  Many people also
keep mementos of their firearms, including digital photographs
or recordings of themselves possessing or using firearms on
their cell phones, smart phones, computers, and other digital
devices.  It has been my experience that prohibited individuals
who own firearms illegally will keep the contact information of
the individual who is supplying firearms to prohibited
individuals or other individuals involved in criminal activities
for future purchases or referrals.

b.  Correspondence between persons buying and selling
firearms often occurs by e-mail or text message sent to and from
smart phones, laptops, or other digital devices.  This includes
sending photos of the firearm between the seller and the buyer,
as well as negotiation of price.  In my experience, individuals
who engage in street sales of firearms frequently use e-mail and

text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

c. Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30. As used herein, the term "digital device" includes the SUBJECT DEVICES.

31. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult

17

with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    Several of the devices listed in Attachment A are believed to contain multiple gigabytes of storage space.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[5] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-

_____

[5] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

          e.    Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,

                                19

what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

g.    Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image

file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

32.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

33.   Based on the foregoing, there is probable cause to believe that GREY violated Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm).

34.   Furthermore, there is also probable cause to believe that evidence, fruits, and instrumentalities of the offenses

//

//

described in Attachment B will be found on the digital devices
described in Attachment A.

/S/
HANNAH MONROE
Special Agent,
Federal Bureau of Investigation

Subscribed to and sworn before
me this 12th day of June, 2018.

PAUL L. ABRAMS

THE HONORABLE PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

23