# CRIMINAL MINUTES – GENERAL   'O'

| Case No. | CR 18-00412-CAS - 1 | Date | September 13, 2018 |
|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | |
| Interpreter | N/A | | |

| Catherine Jeang | Not Present | Kevin Reidy, Not Present |
| | | Lawrence Middleton, Not Present |
| *Deputy Clerk* | *Court Reporter / Recorder, Tape No.* | *Assistant U.S. Attorneys* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| FRANZ GREY | NOT | X | | GEORGINA WAKEFIELD | NOT | | X |

**Proceedings:** (IN CHAMBERS) - DEFENDANT FRANZ GREY'S MOTION TO SUPPRESS EVIDENCE (Dkt. 18, filed July 23, 2018)

DEFENDANT FRANZ GREY'S MOTION TO DISMISS CASE (Dkt. 20, filed July 24, 2018)

DEFENDANT FRANZ GREY'S MOTION TO SEVER COUNTS (Dkt. 21, filed July 24, 2018)

## I. INTRODUCTION

Defendant Franz Grey was indicted on June 29, 2018. The indictment charged defendant as a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1) (Count 1) and with possession of an unregistered firearm in violation of 21 U.S.C. § 5861(d) (Count 2). Dkt. 11.

On July 23, 2018, defendant filed a motion to suppress evidence. Dkt. 18 ("MTS"). On July 24, 2018, defendant filed a motion to dismiss the indictment, dkt. 20 ("MTD), and a motion to sever counts, dkt. 21 ("Motion to Sever"). On July 30, 2018, the government filed an opposition to the motion to suppress. Dkt. 25 ("Opp'n"). On July 31, the government filed an opposition to the motion to dismiss, dkt. 26 ("Opp'n to MTD"), and an opposition to the motion to sever, dkt. 28 ("Opp'n to Sever"). On August 6, 2018, defendant filed a reply in support of the motion to suppress. Dkt. 29 ("Reply"). On August 10, 2018, the government filed a sur-reply in opposition to the motion to suppress. Dkt. 30 ("Sur-reply").

The Court held an evidentiary hearing on August 21, 2018 and August 24, 2018. Defendant filed a post-hearing brief on August 31, 2018. Dkt. 51 ("Def. Post-Hearing Brief"). The government filed its post-hearing brief on September 5, 2018. Dkt. 52 ("Gov. Post-Hearing Brief").

Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II. BACKGROUND

### A. City of Lancaster's Code Enforcement Efforts

In October 2017, the Code Enforcement Division of the City of Lancaster's Department of Housing and Neighborhood Revitalization began investigating defendant for possible violations of the City of Lancaster Municipal Code ("LMC"). Dkt. 18-2, Def. Ex. A, City of Lancaster Warrant Application ("Warrant") ¶ 6. The investigation primarily focused on complaints from neighbors that defendant's property was "surrounded by tarps," that there was "a camera mounted on a 30-foot pole" and numerous lights on the roof of the house, and that there was "electrical wiring along the fence, which they were concerned meant the fence itself was electrified." Id. The neighbors also suspected that defendant "was conducting an unlawful auto repair business at the property." Id.

In November 2017, City of Lancaster Code Enforcement Officer Sam McNutt viewed defendant's property from the street and confirmed that "tarps surrounded the premises and covered much of the roof" and that "areas of fences/walls exceed the permissible height." Id. at ¶ 7. McNutt was unable to observe most of the premises because the tarps and other materials blocked his view. Id. McNutt did not determine whether the electrical wiring along the fence was there to electrify the fence or provide power for another purpose. Id. McNutt also spoke with defendant at some point in November 2017, but was unable to elicit defendant's cooperation in correcting the alleged LMC violations. Id. ¶ 8. Defendant did not respond to McNutt's attempts to contact him after their initial conversation. Id. McNutt also spoke to the property owner who said she had spoken with her tenant, the defendant, and that he refused to make the corrections that were needed to bring the property into compliance. Id.

In January 2018, McNutt returned to inspect defendant's property from the street. Id. ¶ 7. Based on his observations, McNutt issued administrative citations to defendant on February 1, 2018, and on March 2, 2018. Id. ¶ 9. Defendant appealed the citation on March 12, 2018, and then made "continuous" phone calls and faxes to the City Clerk's office. Id. ¶ 10. Code Enforcement personnel expressed safety-related concerns about returning to his property due to defendant's multiple calls and faxes to the City Clerk's office and the electrical wiring around his fence. Id.

**CRIMINAL MINUTES – GENERAL**        'O'

In March 2018, defendant's code enforcement case was referred to Russell Bailey. Dkt. 25-1, Bailey Declaration ("Bailey Decl.") ¶ 3. Russell Bailey is a reserve (part-time) Los Angeles Sheriff's Department ("LASD") deputy who served as a deputy with the LASD for 38 years prior to becoming a managing member of California Municipal Compliance Consultants, LLC ("CMCC") in 2017. Bailey Decl. ¶ 2; Warrant ¶ 2. CMCC has contracted with the City of Lancaster "to provide municipal compliance services related to quality-of-life issues" and "to provide general municipal code enforcement services." Warrant ¶ 2. Bailey states that his work for the City of Lancaster is not as a law enforcement officer. Bailey Decl. ¶ 2.

On March 15, 2018, Bailey and Mike Kuper, another reserve LASD deputy and contractor, went to defendant's property upon the request of the City of Lancaster Public Safety Director, Lee D'Errico. Id. ¶ 11; Bailey Decl. ¶ 3. D'Errico told Bailey that the City had received a complaint from defendant's neighbor that defendant had electrified his fence. Bailey Decl. ¶ 3. Upon arriving at defendant's property, Bailey saw a six-foot-high chain link fence surrounding the premises, tarps attached to the fence which obstructed the view of the property from the public right-of-way, a large canopy-type structure covering the driveway, a long pole extending from the roof of the residence with a video camera and a large light installed on top, and an electrical wire running along the top of the fence. Bailey Decl. ¶ 4; Warrant ¶ 11. Bailey and Kuper tested the fence and determined that it was not electrified. Warrant ¶ 11.

During this March 15 inspection, Bailey went to defendant's property and spoke with defendant from outside the fence through a small hole in the tarp. Bailey Decl. ¶ 4. Bailey identified himself and told defendant that he had come to talk about the fence. Id. Defendant told Bailey that he had "fortified" his residence because his neighbor constantly harasses, intimidates, and threatens him, and that prior to erecting the fence, his neighbor had shot at his dogs with a pellet gun and his car had been vandalized. Warrant ¶ 13; Bailey Decl. ¶ 4. Defendant also stated that the wire along the fence was connected to an audio alarm device inside his house. Warrant ¶ 12. Bailey told defendant that the height and condition of the fence appeared to be a violation of the LMC and would need to be corrected. Warrant ¶ 15.

During this conversation, Bailey also observed three cars parked in defendant's yard, including on unpaved portions of the premises. Warrant ¶ 14; Bailey Decl. ¶ 4. Bailey believed that the presence of the cars corroborated the neighbors' complaints that defendant was operating an unlawful auto repair business on defendant's property. Warrant ¶ 14. After their conversation with defendant, Bailey and Kuper drove to the rear of the property and observed a large tarp that had been installed such that vision into the rear yard was entirely obstructed. Warrant ¶ 16. Bailey also took photos of the property documenting the fencing, tarps, canopy, and camera. Warrant at 20–26.

Based on his conversation with defendant, including defendant's statement about "fortifying" his house, and his observations of defendant's demeanor, Bailey believed that

defendant would not agree to abate the conditions on his property and that defendant could pose a threat to City of Lancaster enforcement officers. Bailey Decl. ¶ 5. Bailey asked another LASD deputy about defendant, and that deputy told Bailey that they were already aware of defendant and that they had received several calls about his property, including about firearms being shot into the air. Bailey Decl. ¶ 5.

Bailey then met with City of Lancaster Assistant City Attorney Jocelyn Corbett, D'Errico, and Kuper. Bailey ¶ 6. During that conversation, Bailey learned that defendant's case had been turned over to Bailey by the Code Enforcement team because of a concern for the team's safety. Id. As a result of this conversation, Bailey, Corbett, and D'Errico decided that an inspection was necessary to determine if the property was safe and what further action was needed. Bailey Decl. ¶ 6.

### B. LASD's Criminal Investigation

On April 4, 2018, one of defendant's neighbors called the Lancaster Community Appreciation Program ("LANCAP") team of the LASD regarding ongoing issues with defendant. Dkt. 18-3, Def. Ex. B, Police Incident Report ("Report") at 5. LASD Deputy Andrew Chappell contacted the neighbor and the neighbor stated that defendant had shot a Glock handgun into the air several times during the prior year's Fourth of July holiday. Id. The neighbor reported that following the Fourth of July, defendant's behavior became "bizarre" and that defendant had started to do "strange things" like stringing up multiple tarps in his backyard and installing flood lights that illuminated defendant's backyard along with the backyards of several of his neighbors. Id. The neighbor said he saw multiple pieces of heavy equipment in the backyard of defendant's house, including vehicle parts, firearm parts, and different tools. Id. Then in October 2017, according to the neighbor, defendant showed him a large amount of methamphetamine. Id. Afterwards, defendant invited the neighbor to his house several times and reportedly showed him an "old and beat up" AK-47 rifle, a black Glock brand handgun, a "snub nose" revolver with a blued finish, many firearm parts including stocks, barrels, and slides to semi-automatic pistols, and firearm ammunition. Id. During one of these visits, defendant allegedly loaded the AK-47 and shot it into the air multiple times from defendant's backyard. Id. at 6. The neighbor also reported seeing defendant carrying firearms on his person and keeping firearms in the trunks of the vehicles parked on his property. Id.

The neighbor reported that around December 2017, defendant installed fencing in the front yard, along with a camouflage tarp along the fence, as well as thirty-foot poles with cameras affixed to them. Id. The neighbor reported that he was concerned that the fence might be electrified because of an electrical wire attached to the fence. Id.

The neighbor also reported that he last saw defendant shoot a gun in his backyard in early March 2018. Id. The neighbor also complained of smelling a burning chemical smell from defendant's property. Id.

When asked why the neighbor had waited so long to report the crimes, the neighbor said that he wanted to keep to himself and tried to give defendant the benefit of the doubt that he was mentally ill.  Id.  However, the neighbor believed that in March 2018, defendant had made a false allegation of child abuse to DCFS, and that was "the straw that broke the camel's back."  Id.

Deputy Chappell then generated a six-pack photographic lineup with defendant's photograph and showed the lineup to the neighbor, who identified defendant.  Id. at 7.  The neighbor also identified the car driven by defendant and provided Deputy Chappell with photographs he had taken of defendant's front and back yard.  Id.

The day after Deputy Chappell's interview with the neighbor, Chappell drove by defendant's house with Deputy Danny Ornelas.  Id.  As he drove by, he smelled a strong odor of a chemical-like substance emitting from the house and observed the fence and tarp described by the neighbor.  Id.  Deputy Chappell saw defendant in his garage as well as several vehicles in the driveway and garage.  Id.

Deputy Chappell then contacted several other neighbors of defendant who wished to remain anonymous and they "collectively" told Chappell that defendant was "weird," "unhinged," "not all there," and "strange."  Id.  The neighbors reportedly feared defendant and his "increasingly odd behavior."  Id.

Deputy Chappell also contacted Code Enforcement Officer, McNutt, who showed Chappell his case file on defendant's house and told Chappell that defendant and his landlord had been generally uncooperative.  Id.  McNutt told Chappell that defendant refused to take down the fencing around the front of the property despite three separate city-issued citations.  Id.

Deputy Chappell also contacted Deputy Kuper who told Chappell that he had gone to defendant's property on March 13, 2018, and that defendant acted very strange as if he had a mental illness.  Id.  Kuper also reported that defendant seemed extremely paranoid and would only talk to him through a crack in the gate at the driveway.  Id.

Deputy Chappell then checked defendant's criminal history and determined that he had been convicted of felony driving under the influence in 2008.  Id. at 8.  Chappell also saw that defendant had multiple drug-related arrests and that he had been convicted of felonies in Louisiana and Pennsylvania, including voluntary manslaughter.  Id.

Deputy Chappell also reviewed calls for service to defendant's address and saw that there were several calls for service in which deputies had been dispatched to the location regarding loud music being played.  Id.  On October 25, 2017, deputies were dispatched to defendant's property because another neighbor had reported a gun being fired into the air.  Id.

Based on his interview with the neighbor and his subsequent investigation, Deputy Chappell formed the opinion that defendant was a felon in possession of a firearm and ammunition, that he was in the possession of a controlled substance, and that he had negligently discharged firearms multiple times. Id. Deputy Chappell filed a police report dated April 5, 2018, regarding defendant's alleged possession of firearms and ammunition, and it was approved by Deputy Chappell's supervisor, Sergeant D. Wolanski, on April 6, 2018. Id. at 2. During the evidentiary hearing, Wolanski testified that he did not believe the LASD had probable cause to either arrest defendant or search his home at this time. Dkt. 49 ("8/21/18 Transcript") at 10:8–23.

### C. The Inspection Warrant

Assistant City Attorney Jocelyn Corbett states that she decided to seek an inspection warrant for defendant's property in late March 2018, as she thought it "was necessary to get behind the tarps and other code-violating obstructions and see if there were additional violations inside the house, particularly with respect to obstructions for first responders." Dkt. 30-1 Declaration of Jocelyn Corbett ("Corbett Decl.") ¶ 12. On April 10, 2018, during an event at Lancaster City Hall, Corbett had a brief discussion with a LASD deputy and D'Errico about defendant's property and Corbett informed them that she was going to obtain a warrant for that property. Id. ¶ 14. And around this time, Deputy Chappell told Sergeant Wolanski that the City was going to write an inspection warrant for defendant's property and that the City had asked LASD to help with security at the inspection because of "the way that the property was situated" and "defendant's suspected involvement with guns." Dkt. 25-3, Declaration of Daniel Wolanski ("Wolanski Decl.") ¶ 4.

In late April, Corbett helped Bailey draft the warrant affidavit. Id. ¶ 15. On May 1, 2018, the City filed an application for an inspection warrant supported by Bailey's affidavit in Los Angeles County Superior Court. Warrant at 6–7. In the warrant affidavit, Bailey detailed the City's investigation into defendant's alleged LMC violations beginning in October 2017. Id. ¶¶ 6-17. Based on Bailey's inspection on March 15, 2018, the affidavit asserted violations of the LMC: (1) maintenance of tarps or similar coverings on, or over, any roof of any structure, except during periods of active rainfall (LMC § 8.28.030(A)(27)); (2) vehicles parked or stored on unpaved portions of the premises (LMC § 10.04.050); and (3) fences that exceed the height allowances (maximum 3 ½' at front yard setback, and 6' in side and rear yards) (LMC § 17.08.130). Id. ¶ 18.

Bailey also stated that due to the obstructions, it was not possible to determine whether the tarps, canopies, and other structures and coverings hindered egress from the residence in the event of a fire or emergency, which would violate LMC § 8.28.030(A)(7). Warrant ¶ 19. Bailey concluded that this would "pose a very serious life safety hazard to the tenant and to emergency responders." Id. Bailey also concluded that the conditions on defendant's premises

violated the LMC provision that prohibits any condition that constitutes a public nuisance, blight, or a health or safety hazard to the community or neighboring properties. Id. ¶ 20.

Bailey also stated his belief that defendant would not cooperate with any effort to bring his property into compliance with the LMC and that it may be necessary for the City to undertake abatement actions to eliminate the violations. Id. ¶ 21.

In his affidavit, Bailey stated: "In order to ascertain the extent to which unlawful and potentially hazardous conditions are present, and in order to determine the scope of abatement actions that the City may need to undertake, it is necessary for the City to conduct a comprehensive inspection of the premises and residence." Id. ¶ 22. Bailey requested an inspection warrant "to authorize [himself] and City and County personnel to enter the premises and to inspect and photograph all yard areas as well as the interior areas of all structures, to assess the extent to which hazardous conditions are present, and to ascertain what abatement actions may be necessary to eliminate such conditions and bring the property into substantial compliance with the Lancaster Municipal Code." Id. ¶ 23. The affidavit also sought: (1) the assistance of LASD Deputies "to ensure that interference with the same does not occur"; (2) exemption from the 24-hour advance notice requirement of the issuance of the warrant because of the concern that defendant "may react inappropriately or violently" upon learning of the warrant; (3) authorization to execute the warrant in the absence of defendant if he is absent; and (4) authorization to forcibly enter yard areas on the premises and the dwelling if defendant refuses access because "it is unknown whether personnel executing the Warrant may be in jeopardy" as "it cannot be determined whether other persons live in the residence, and in light of [defendant's] odd behavior and comments it is not known whether he may have undertaken additional 'fortifications' in the yard areas or inside the house." Id. ¶¶ 24–26.

The Los Angeles Superior Court approved the warrant later that day and found cause to believe that LMC violations "exist, or may exist," at defendant's property. The warrant authorized the City to "make an inspection of the interior and exterior areas of all structures" and granted all of the additional requests made in Bailey's affidavit, including the assistance of LASD deputies in the execution of the warrant, waiver of the 24-hour advance notice requirement, and permission to forcibly enter the yard areas and dwelling. Id. at 3.

### D.　　Defendant's Arrest and Execution of the Inspection Warrant

After the inspection warrant was obtained, Deputy Chappell was contacted and placed in charge of assisting the City with the inspection warrant because he was the deputy leading the criminal investigation of defendant. 8/21/18 Transcript at 11:4–16. Sergeant Wolanski testified that prior to the execution of the inspection warrant, either Deputy Lopez or Deputy Chappell created an operations plan because they were in charge of the criminal investigation. Id. at 11:17–12:8. Wolanski directed the deputies to arrest defendant if they encountered him outside of the home while they were helping with the inspection warrant. Lopez Decl. ¶ 3; 8/21/18

Transcript at 12:19–13:1.  Wolanski also intended to interview defendant about the criminal investigation during the execution of the inspection warrant.  8/21/18 Transcript at 13:2–4.

On May 3, 2018, city employees and the entire LANCAP team, consisting of nine LASD deputies, went to defendant's house shortly before 10:00 a.m.  Dkt. 18-4, Def. Ex. C at 13.  Wolanksi explained that the LANCAP team provides security for City employees in the performance of their duties, and thus they were there that morning "to assist the City of Lancaster personnel with executing an inspection warrant at that location by making sure that the property was safe before inspectors began their work."  Wolanski Decl. ¶¶ 2, 5.  Among the deputies present were Deputy Chappell, his supervisor, Sergeant Wolanski, and Deputy Armando Lopez.  Id.  At least two officers, Sergeant Wolanski and Deputy Lopez, were wearing body cameras that day, though the body camera footage shows that they turned their body cameras on and off at various times.  See, e.g., Dkt. 19, Def. Ex. E, F.  Wolanksi explained that the LASD was there "to assist the City of Lancaster personnel with executing an inspection warrant at that location by making sure that the property was safe before inspectors began their work."  Wolanski Decl. ¶ 5.  The deputies were part of LANCAP and through LANCAP they work with Lancaster's Department of Public Safety to provide security for City employees in the performance of their duties.  Wolanski Decl. ¶ 2; Dkt. 25-2, Declaration of Armando Lopez ("Lopez Decl.") ¶ 2.  At the evidentiary hearing, Corbett testified that it is the City's policy to have at least one LASD deputy accompany an inspection but that she did not know LASD planned to send nine armed deputies nor did she request the presence of that many law enforcement personnel.  Dkt. 45 ("8/24/18 Transcript") at 29:7–21.

       i.      **The Arrest**

Sergeant Wolanski arrived at the property and waited around the corner while another LANCAP deputy conducted surveillance of the property.  Wolanski Decl. ¶ 7.  Soon after Wolanski arrived, the other deputy saw defendant standing in his driveway.  Id.  Wolanski "made up a ruse" that the officers needed to inspect his welding equipment and thus they needed defendant to open the gate so they could inspect his equipment.  Id.  Sergeant Wolanski initially stated in his declaration that when defendant opened the gate, another deputy placed him under arrest for negligent discharge of a firearm and felon in possession of a firearm.  Id.  At the evidentiary hearing, Wolanksi testified that by "arrest" he "mistakenly meant detention."  8/21/18 Transcript at 5:1.  There is no body camera footage of this encounter.  After handcuffing defendant, officers placed him in the back of a patrol car.  Sergeant Wolanski turned on his body camera and asked defendant to identify himself for the camera.  Dkt. 19, Def. Ex. E.  Defendant sat handcuffed and shirtless in the back of the patrol car while Wolanski asked him if he had any large sums of cash or valuables in the house, whether he had any weapons inside the house, and whether he had anything in the house that was going to hurt the officers.  Dkt. 19, Def. Ex. E (app. 10:02:20–10:02:34).  Defendant answered no to all the questions and asked Wolanski why he was searching the house.  Id.  Wolanski did not answer,

shut the door to the car, and turned off his body camera. Id. Deputy Lopez stated in his declaration that he arrived shortly after defendant's arrest. Lopez Decl. ¶ 6.

### ii. The Initial Search of the Inside of Defendant's House

Around 10:00 that morning, "before executing the warrant and as part of their orders to provide security for the inspection, LASD deputies entered the house to look around and determine whether there were other individuals or any dangerous conditions inside the house that could harm City of Lancaster inspectors . . ." Id. ¶ 8. Before entering the house, Wolanski turned on his body camera. Dkt. 19, Def. Ex. F. The deputies drew their weapons and approached the house. Id. Using defendant's keys, they entered the house with their weapons drawn. Id. The body camera captured an officer using a flashlight attached to his gun to search behind and next to the couch in the living room. Id. (app. 10:14:35–10:14:40). The body camera turned off as the officers started to move into the other rooms of the house. Id.

During their survey of defendant's house, Sergeant Wolanski and Deputy Lopez state that they viewed firearms and ammunition in plain view. Lopez Decl. ¶ 8; Wolanski Decl. ¶ 9. At the evidentiary hearing, Wolanksi testified that this "walk-through" took "a couple of minutes," 8/21/18 Transcript at 8:7–11, but Lopez stated that it took fifteen to twenty minutes to complete. Id. at 48:24–49:2. Both Wolanski and Lopez testified that they did not touch any items in the house during this survey. After determining that the house was safe, the officers then went outside to await a warrant to search defendant's residence. Wolanski Decl. ¶ 9.

Deputy Lopez drafted the affidavit for a search warrant. Lopez Decl. ¶ 8. In his affidavit, Lopez stated that "while assisting the City of Lancaster with an abatement warrant . . . [he] saw in plain view, multiple handguns (one of which was clearly loaded), rifles, firearm parts, and ammunition while inside . . ." Dkt. 18-5, Def. Ex. D, Search Warrant and Affidavit ("Search Warrant") at 7. Lopez also stated that he observed drug paraphernalia and a large amount of an off-white crystalline substance resembling methamphetamine in plain view. Id. Lopez added that the controlled substance was "in plain view on the coffee table of the living room," that "ammunition and firearm accessories were seen on multiple tables throughout the location in plain view," and that "multiple firearms were seen on the floor and on a desk inside of one of the bedrooms." Id. Based on these observations and defendant's status as a convicted felon, Lopez sought a search warrant for defendant's house. Id.

### iii. Execution of the Inspection Warrant

Bailey and McNutt remained outside and, after the property was secured, they went inside to conduct the code enforcement inspection. Bailey Decl. ¶ 10; Lopez Decl. ¶ 10. At the evidentiary hearing, Bailey testified that this inspection took place sometime between 10:00 and 11:00 a.m. 8/24/18 Transcript at 19:16–21. The City found numerous public nuisance conditions including hazardous and unpermitted construction, electrical extensions, and heating

equipment, and significant accumulations of junk throughout the premises and inside the residence, which posed a fire hazard and impeded emergency egress through the house. Dkt. 25-1, Order to Vacate, at 1–2. Based on these findings, the City issued an administrative order to vacate defendant's property on June 5, 2018. Bailey Decl. ¶ 11.

### iv. Execution of the Search Warrant

Based on Lopez's application and supporting affidavit, a Los Angeles Superior Court judge issued a search warrant for defendant's property that afternoon. Id. at 2. At approximately 2:00 p.m., LASD then searched defendant's property and found several firearms, ammunition, and a large amount of currency. Lopez Decl. ¶ 9; Dkt. 18-4 at 13.

### v. LASD's Interview of Defendant

At some point after defendant's initial arrest, defendant was transported to the Lancaster Sheriff Station where Detective Mahoney read defendant his Miranda Rights and interviewed him about the devices and powders found inside his home. Dkt. 29-6 at 2. Although the parties' briefs do not specify a time, Mahoney stated in his report that he was called to the Sheriff Station because LASD deputies located items they believed to be components of a pipe bomb following the service of a search warrant. Id. Sergeant Wolanski and Deputy Lopez also interviewed defendant about his possession of firearms and ammunition. Id. at 16–17.

## III. MOTION TO SUPPRESS EVIDENCE

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." United States v. McClendon, 713 F.3d 1211, 1215 (9th Cir. 2013).

Defendant moves to suppress all physical evidence obtained in violation of the Fourth Amendment following his arrest and the administrative inspection of his residence on May 3, 2018. MTS at 2. Defendant argues that the LASD's initial search of his home violated his Fourth Amendment rights because the LASD's assistance in the execution of the inspection warrant was a pretext to conduct a criminal search, arrest, and investigation. Thus, defendant argues, because the subsequent search warrant was obtained as a direct result of the initial unlawful search, all evidence seized, and the fruits derived from that search, should be excluded at trial. See MTS at 12–13. The government argues that any secondary motivation to find evidence of criminal activity while securing defendant's house does not render its actions pretextual. See Opp'n at 18–20.

A.   **Legal Standard**

"[A]n administrative search may not be converted into an instrument which serves the very different needs of law enforcement officials.  If it could, then all of the protections traditionally afforded against intrusions by the police would evaporate, to be replaced by the much weaker barriers erected between citizens and other government agencies." Alexander v. City & Cty. of San Francisco, 29 F.3d 1355, 1361 (9th Cir. 1994).  The Supreme Court in Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 537 (1967), held that the prohibition of unreasonable searches applies to those conducted by municipal health and safety inspectors, but that such searches could be conducted pursuant to an administrative warrant precisely because the nature of such inspections are "neither personal in nature nor aimed at the discovery of evidence of a crime" and therefore "involve a relatively limited invasion of the urban citizen's privacy."  "The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence of a criminal case must meet stern resistance by the courts." Abel v. United States, 362 U.S. 217, 226, 230 (1960) (holding that evidence uncovered by a search incident to an arrest on an administrative deportation warrant was admissible, but cautioning that their "view of the matter would be totally different had the evidence established . . . that the administrative warrant was here employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions, rather than as a bona fide preliminary step in [an administrative] proceeding").

"A limited administrative search cannot also serve unrelated law enforcement purposes." United States v. $124,570 U.S. Currency, 873 F.2d 1240, 1247 (9th Cir. 1989).  "[O]nce a search is conducted for a criminal investigatory purpose, it can no longer be justified under an administrative search rationale." Id. at 1246 n.5.  Thus, while subjective motivations of police officers are usually "irrelevant in determining whether the circumstances objectively justified the action taken or the intrusion occasioned," United States v. McCarty, 648 F.3d 820, 832 (9th Cir. 2011) (citing Ashcroft v. Al-Kidd, 563 U.S. 731, 736 (2011)), "'actual motivations' do matter" in administrative search cases, id. (quoting Al-Kidd, 563 U.S. at 736).  "[S]ome inquiry into the actual motivations behind an administrative search is permitted to guard against wholly pretextual intrusions into the public's reasonable expectations of privacy." Id.

B.   **Discussion**

   i.   **Whether the Search Pursuant to the Administrative Warrant was Conducted in Furtherance of a Criminal Investigation**

The record demonstrates that the LASD deputies who participated in the search conducted pursuant to the administrative warrant had formed the intent to uncover evidence of a crime and to arrest defendant prior to arriving at defendant's house.  The LANCAP team of the LASD—specifically Deputy Chappell—initiated a criminal investigation of defendant on April

4, 2018, and concluded that defendant was a felon in possession of a firearm and ammunition, that he was in the possession of a controlled substance, and that he had negligently discharged firearms multiple times. Report at 5. Sergeant Wolanski approved Deputy Chappell's police report on April 6, 2018, id. at 2, but testified that he did not believe that LASD had probable cause to either arrest defendant or search his home at that point in time, 8/21/18 Transcript at 10:8–23. Subsequently, Chappell and Wolanski learned that the City was going to obtain an inspection warrant to enter defendant's residence and that the City was going to request LASD's assistance at the inspection. Corbett Decl. ¶ 14; Wolanski Decl. ¶ 4. The record does not show that LANCAP took any action to investigate further or otherwise develop probable cause to arrest defendant or search his home until a month later on May 3, 2018, the day the administrative warrant was executed.

After the City obtained its inspection warrant, Deputy Chappell was contacted and placed in charge of assisting the City with the execution of the warrant *because* he was the deputy leading the criminal investigation into defendant. 8/21/18 Transcript at 11:4–6. Sergeant Wolanski intended to interview defendant about the criminal inspection during the execution of the inspection warrant and instructed the LANCAP team to arrest defendant. Id. at 13:2–4, 12:19–13:1; Lopez Decl. ¶ 3. And although the usual City policy is to have at least one LASD deputy accompany the City during an inspection, LASD sent nine deputies to assist with the inspection warrant. 8/24/18 Transcript at 28:7–21.

After arresting defendant, nine armed LASD deputies went into defendant's home without a criminal search warrant and spent fifteen to twenty minutes inside. 8/21/18 Transcript at 48:24–49:2. Defendant points out that the timestamps on the photographs LASD took of the inside of defendant's home indicate that the photos were taken at 10:40 a.m., dkt. 47-2, suggesting that the LASD's initial entry of defendant's home may have lasted even longer than twenty minutes. And defendant also demonstrates that desk drawers were opened and closed and items were touched and moved inside of the home at some point before the criminal search warrant was executed. See Def. Post-Hearing Brief at 7 (comparing a photograph taken at 10:40 a.m. with just one desk drawer open, dkt. 47-2 at 1, with a video capturing the condition of the home prior to the execution of the search warrant showing that the desk drawer was closed and another two drawers were opened, dkt. 47-1). The length of time the deputies spent in the house, the fact that they touched items and opened and closed drawers, and took photographs of incriminating evidence are all consistent with the LASD's motivation to uncover criminal evidence.

The Court thus finds that the LASD used the administrative warrant to enter defendant's home without a criminal search warrant for the purpose of gathering evidence for its criminal case. This is not a case in which an administrative search evolved into criminal search based on the discovery of criminal activity during the course of the search. Rather, the evidence shows that the LASD deputies in question formed an intention before even arriving at defendant's

home on May 3, 2018, to arrest defendant and interview him about his possession of firearms while assisting the City with the execution of the administrative warrant.

The government argues that "the presence of a criminal investigatory motive, by itself, does not render an administrative [search] pretextual" and that courts ask "whether the officer *would* have [conducted the search] in the absence of the invalid purpose." United States v. Orozco, 858 F.3d 1204, 1213 (9th Cir. 2017) (emphasis in original). Thus, according to the government, since the deputies would have gone inside of defendant's home to assist with the execution of the inspection warrant regardless of any purpose to find evidence of a crime, defendant's pretext argument must fail. Gov. Post-Hearing Brief at 5–6.

The government argues that the Court should disregard the evidence demonstrating that the deputies were conducting a criminal investigation because the administrative search warrant provided a legal basis for LASD to go inside of defendant's home. This cannot be. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006). The government's position would essentially allow police officers to rely on an administrative search warrant for law enforcement purposes whenever an administrative search warrant provides for police involvement, in contravention of the Ninth Circuit's admonishment that "an administrative search may not be converted into an instrument which serves the very different needs of law enforcement officials." Alexander, 29 F.3d at 1361. Although secondary motivations may not matter during the course of an ordinary administrative search, the Court is still required to examine the extent to which "administrative searches are used for purposes other than those contemplated by the regulatory scheme, [as] they may fall outside the rationale by virtue of which [the Ninth Circuit has] approved them." $124,570 U.S. Currency, 873 F.2d at 1243.

In Alexander, the San Francisco Public Health Department obtained a forcible entry inspection warrant to inspect a home that was leaking sewage from the basement into the street. 29 F.3d at 1357. Public health officials arrived at the house accompanied by a sergeant from the San Francisco Police Department. Id. at 1358. When the resident refused to allow them to enter and yelled "I'm going to get my gun and use it," the sergeant radioed for reinforcements and a tactical team and hostage negotiators arrived at the scene. Id. After the resident refused to respond for nearly an hour, the officers decided to enter the house and take the resident into custody. Id. Reviewing these facts, the Ninth Circuit explained that "if in fact the officers' primary purpose in storming the house was to arrest [the resident] rather than to assist the health officials in executing the inspection warrant, then [the resident's] Fourth Amendment rights were violated." Id. at 1360. Even though a municipal judge had approved a forcible entry inspection warrant and the police were there to assist with that warrant, "[w]ithout an arrest warrant, and without exigent circumstances, the police had no right to enter [the resident's] house for the primary purpose of arresting him. The inspection warrant was just that: an inspection warrant." Id. at 1361.

In <u>$124,570 U.S. Currency</u>, customs agents were alerted by security agents at the airport that a man who had passed through an airport security check was carrying a large amount of money. 873 F.2d at 1241. The customs agents ultimately searched his briefcase and found incriminating evidence. Security personnel and law enforcement officials at the airport had an "established working relationship" wherein security personnel worked "hand-in-hand" with customs agents to detect and report the presence of drugs and currency. <u>Id.</u> at 1245. The Ninth Circuit found that this close relationship had "a significant distorting effect on airport searches" which "materially alter[ed] the calculus by which [they] held such warrantless searches reasonable." <u>Id.</u> And although the relationship between law enforcement authorities and security personnel at the airport "no doubt makes much sense from a law enforcement perspective," the Ninth Circuit found that it made "[t]oo much sense. It effectively transforms a limited check for weapons and explosives into a general search for evidence of crime." <u>Id.</u> at 1247.

"The subjective intent of the individual officer in [an administrative] search thus becomes as relevant as objective conduct only at the point at which the search ceases legitimately to be for the valid administrative purpose, as that is the point after which the administrative exception can no longer justify continuation of the warrantless search." <u>McCarty</u>, 648 F.3d at 835. Here, because the LASD officers who conducted the initial search were pursuing their criminal enforcement goals even before arriving at defendant's house, the "administrative exception" cannot justify the LASD's search of defendant's home. As in <u>Alexander</u> and <u>$124,570 U.S. Currency</u>, the criminal enforcement motivations of the officers involved in the execution of an administrative search "altered the calculus" by which their assistance with the inspection warrant was otherwise deemed reasonable by the judge who authorized the warrant. 873 F.2d at 1245. "The inspection warrant was just that: an inspection warrant," <u>Alexander</u>, 29 F.3d at 1361, not authorization to enter in furtherance of a criminal investigation.

Accordingly, the Court finds that LASD's initial search of defendant's home in reliance on the City's inspection warrant was an unreasonable search under the Fourth Amendment.

### ii. Whether to Suppress Evidence Found Inside Defendant's Home

"Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." <u>United States v. McClendon</u>, 713 F.3d 1211, 1215 (9th Cir. 2013) (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 484–87 (1963)). The Court acknowledges that "[i]f evidence of criminal activity is discovered during the course of a valid administrative search, it may be seized under the 'plain view' doctrine." <u>Michigan v. Clifford</u>, 464 U.S. 287, 294 (1984) (citing <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 465–66 (1971)). However, the Court finds that the administrative search exception did not provide a basis for the LASD to be present inside of defendant's home without a criminal search warrant

supported by a traditional showing of probable cause.  Thus, the evidence obtained as a result of LASD's initial entry into defendant's home on May 3, 2018, is inadmissible under the exclusionary rule.  See Wong Sun, 371 U.S. at 484–87.  Because the evidence gathered by LASD when they initially entered defendant's home served as the basis for the criminal search warrant they obtained later that day, the evidence LASD obtained pursuant to the search warrant is also inadmissible under the exclusionary rule.  The government has made no showing that probable cause would have still existed to obtain a criminal search warrant without the evidence that was uncovered during the initial search of defendant's home.

### iii.    Whether to Exclude Defendant's Post-Search Statements

The record shows that after defendant was arrested and transported to the Lancaster Sheriff Station, Detective Mahoney, Sergeant Wolanksi, and Deputy Lopez questioned defendant about the devices, powders, firearms, and ammunition found inside of his home.  Dkt. 29-6 at 2, 16–17.  The parties do not set forth exactly what defendant stated during this questioning, but the affidavit attached to the complaint outlines the scope and nature of defendant's statements.  See Dkt. 1.  During a recorded interview, defendant admitted that the weapons and ammunition were his, that he had materials used for pipe bombs, that he was a felon and knew he was not lawfully permitted to possess a firearm, that he had bought most of the firearms on the street and had assembled the AR-15 rifles found in his residence himself after buying parts off the internet, and that he had made a suppressor/silencer himself after seeing one on YouTube.  Id. at 3, 7–8.

The parties dispute whether defendant's arrest was illegal and whether these statements should be excluded on the basis of the illegality of the arrest.  But "[t]he analysis that applies to illegal detentions differs from that applied to illegal searches."  United States v. Crawford, 372 F.3d 1048, 1056 (9th Cir. 2004).  In United States v. Shetler, 665 F.3d 1150, 1154 (9th Cir. 2011), the police conducted an illegal search of the defendant's home while the defendant was detained outside.  The police questioned the defendant 36 hours later, and the defendant confessed to producing methamphetamine.  Id.  The Ninth Circuit disagreed with the government's argument that because the police had probable cause to arrest the defendant, they would have been able to question him about whether he used or manufactured methamphetamine regardless of any evidence revealed during the illegal searches.  Id. at 1157.  The Ninth Circuit explained that, unlike in an illegal detention case, in an illegal search case "the interrogating officers may confront the suspect, either physically or verbally, with the evidence that has been illegally obtained," and that "the answers the suspect gives to officials questioning him may be influenced by his knowledge that the officials had already seized certain evidence."  Id. at 1158.  The Ninth Circuit ultimately held that the defendant's confession was the product of the illegal search and had to be suppressed.  Id. at 1160.

Shetler controls the present case to the extent the questions posed to defendant were based on facts learned during the illegal search of defendant's home. Defendant's confessions at the station about the weapons and other contraband he possessed appear to have been in response to questions about items that the LASD uncovered during their illegal search of his home. Therefore the next inquiry is whether defendant's statements "were nevertheless sufficiently attenuated from the government's illegal conduct so as not to warrant suppression." Id. at 1159. This attenuation analysis consists of three factors: "(1) the temporal proximity of the search to the confession; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." Id. (citing United States v. $186,416.00 in United States Currency, 590 F.3d 942, 951 (9th Cir. 2010)).

The first factor, temporal proximity, does not weigh in the government's favor because only a few hours passed between the illegal search and when defendant was interviewed. "The relevant question for attenuation purposes is whether this passage of time would have in any way dissipated [defendant's] perception that the searches had produced evidence such that his remaining silent would be useless, or decreased the extent to which the government's confronting [defendant] with the illegally seized evidence induced his statements." Id. Here, as in Shetler, "there is no reason to think that the passage of [a few hours] would have weakened the causal connection between the illegal searches and [defendant's] statements." Id.

The second factor, intervening circumstances, also does not favor the government because nothing occurred that would have broken the causal chain between the searches and the confession. Although defendant received a Miranda warning, "such warnings are insufficient to 'purge the taint of a temporally proximate prior illegal' act." Id.

The final factor, purpose and flagrancy of the illegal search, also weighs in favor of suppression of defendant's statements. Here, the LASD entered defendant's home under the guise of an administrative inspection warrant and conducted a search that lasted at least fifteen minutes, all while knowing that they did not have a criminal search warrant to search the inside of defendant's home for evidence of a crime. The evidence that the LASD found during this search was the same evidence that was used to obtain a search warrant which uncovered even more criminal evidence, all of which was causally connected to defendant's statements. "Because this unbroken 'causal chain' links the initial illegality and [defendant's] subsequent statement[s], the [statements are] not 'sufficiently an act of free will to purge the primary taint' from the [LASD's] unlawful actions." Id. at 1160 (quoting $186,416.00 in U.S. Currency, 590 F.3d at 953).

Accordingly, any of defendant's statements in response to questions that were informed by the LASD's illegal search of his home may not be used. The record is unclear, however, as to whether any of the questions posed to defendant were not informed by the illegal search. If the government believes that that any of defendant's post-search statements were not the fruit of

the illegal search, the government may file a brief no later than **Monday, September 17, 2018**, not to exceed 10-pages in length, including any authority, evidence, and argument, as to why the Court should not suppress all of defendant's post-search statements.

### C. The Scope of the Administrative Inspection Warrant

The parties devote much of their briefing to the issue of whether the City's request for an inspection warrant to enter the interior of defendant's home was sufficiently particularized to permit its issuance. The government argues that "relaxed administrative cause" does not require "informational precision" as to specific LMC violations that could be found inside defendant's home, sur-reply at 11, while defendant argues that the City was required to provide specific evidence sufficient to support a reasonable suspicion of a violation inside defendant's home, reply at 3. But the Court need not reach this question because even an indisputably valid administrative warrant would not have authorized the LASD to enter defendant's home for the purpose of furthering its criminal investigation of defendant.

## III. MOTION TO DISMISS INDICTMENT

Defendant seeks an order from the Court dismissing the indictment based on Second Amendment and jurisdictional grounds.

Defendant first argues that both counts of his indictment should be dismissed on Second Amendment grounds. With respect to count one, the felon in possession of a firearm offense in violation of 18 U.S.C. § 922(g)(1), defendant cites United States v. Chovan, 735 F.3d 1127, 1138 (9th Cir. 2013), for the proposition that a total prohibition on firearm possession is a "serious encroachment" on the Second Amendment right. Defendant, however, acknowledges that the Ninth Circuit has already addressed a Second Amendment challenge to § 922(g)(1) and held that "[d]enying felons the right to bear arms is . . . consistent with the explicit purpose of the Second Amendment to maintain 'the security of a free State.'" United States v. Vongxay, 594 F.3d 1111, 1117 (9th Cir. 2010).[1] Accordingly, the Court is bound by the Ninth Circuit's holding that § 922(g)(1) "does not violate the Second Amendment as it applies to . . . a convicted felon." Id. at 1118.

Defendant cited no authority to support its Second Amendment challenge to count two, the unregistered silencer offence in violation of 26 U.S.C. § 5861(d). However, the Ninth Circuit has held, in an unpublished memorandum disposition, that the Second Amendment does

---

[1] Defendant notes that the Ninth Circuit has stated that "there are good reasons to be skeptical of the constitutional correctness of categorical, lifetime bans on firearm possession by *all* 'felons.'" United States v. Phillips, 827 F.3d 1171, 1174 (9th Cir. 2016). However, this statement was made in dicta and, as defendant acknowledges, the Ninth Circuit ultimately held that it was bound by Vonxgay. Id. at 1175.

not extend to "dangerous and unusual weapons" such as silencers. United States v. McCartney, 357 Fed.Appx. 73, 76 (9th Cir. 2009); see also United States v. Tomlin, 454 F.2d 176, 176 (9th Cir. 1972) (holding that the registration requirement does not violate the Second Amendment).

Defendant also argues, without citation to any authority, that the conduct at issue was purely intrastate and thus Congress lacked authority to criminalize such conduct under the Commerce Clause. Defendant also contends, without citation to any authority, that Congress lacked authority under the Commerce Clause to criminalize possession of an unregistered silencer. MTD at 5. However, the Ninth Circuit has upheld the constitutionality of both § 922(g)(1) and § 5861(d). See United States v. Rousseau, 257 F.3d 925, 932 (9th Cir. 2001) (rejecting an as-applied Commerce Clause challenge to § 922(g)(1) because the indictment alleged the firearm traveled in interstate commerce); United States v. Tous, 461 F.2d 656, 656 (9th Cir. 1972) (upholding § 5861(d) as "a valid exercise of the power of Congress to tax"). The indictment here alleges that the firearms and ammunition possessed by defendant were "in and affecting interstate commerce." Dkt. No. 1.

Accordingly, the Court declines to dismiss the indictment.

## IV. MOTION TO SEVER COUNTS

Defendant seeks an order from the Court severing the two counts charged in the indictment into two separate trials on the grounds that a joint trial on both counts would unfairly prejudice defendant. Defendant contends that the felon in possession count would unfairly prejudice him with respect to the unregistered silencer count because: (1) evidence that defendant has a prior felony conviction is an element to the felon in possession count but is inadmissible as to the possession of an unregistered firearm count; and (2) other crimes evidence raises a substantial risk that the jury will believe defendant has bad character and is therefore likely to have committed the crime of possession of an unregistered firearm. Motion to Sever at 4.

The government argues that any risk of undue prejudice can be addressed by limiting reference to and argument about defendant's prior conviction and providing standard jury instructions regarding prior acts and the admission of evidence for a limited purpose. Opp'n to Sever at 4-5.

Courts have discretion to sever counts pursuant to Rule 14(a) of the Federal Rules of Criminal Procedure where joinder "appears to prejudice a defendant or the government." The decision whether to sever properly joined defendants under Rule 14 is "committed to the sound discretion of the trial court." United States v. Adams, 581 F.2d 193, 197 (9th Cir. 1978).

The "dominant concern with judicial economy" weighs against severing the counts into two separate trials where both trails would require presentation of the same witnesses and similar testimony. See United States v. Armstrong, 621 F.2d 951, 954 (9th Cir. 1980). Yet,

there is "a high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which evidence would otherwise be inadmissible."  United States v. Lewis, 787 F.2d 1318, 1321 (9th Cir. 1986) (quoting United States v. Daniels, 770 F.2d 1111, 1116 (D.C. Cir. 1985).

At the hearing, the Court requested oral argument on the following issues: (1) What is the government's proposed limiting instruction to avoid prejudice; (2) What is defendant's response to the government's proposal that it will stipulate to defendant's felony conviction and that it will not use defendant's felony conviction during trial; and (3) If defendant decides to testify, will the government refrain from impeaching defendant with his prior convictions.  The parties agreed to confer and inform the Court of their responses at a later date.  Accordingly, the Court defers a ruling on defendant's motion to sever counts.

## V.     CONCLUSION

Defendant's motion to suppress evidence is **GRANTED**.

Defendant's motion to dismiss case is **DENIED**.

Defendant's motion to sever counts is hereby taken under submission.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Deputy Clerk | | CMJ | |